IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION

In re:

JAN MARSHALL DAMBOWSKY,

     Debtor.


JOHN J. HARVEY, JR. and IMPACT
POINT CONSULTING, INC.,

             Plaintiffs,

   v.

JAN MARSHALL DAMBOWSKY, a/k/a
JON MARSHALL,

         Defendant.

Case No. 13-81410
Chapter 7


Adversary No. 14-___

COMPLAINT OBJECTING TO
DEBTOR'S DISCHARGE OR FOR
EXCEPTIONS FROM DISCHARGE


Plaintiffs allege:


## PARTIES AND JURISDICTION

1.    This adversary proceeding arises in the Chapter 7 bankruptcy case of Jan Marshall Dambowsky, who acted with respect to Plaintiffs under the alias Jon Marshall (the "Debtor").

2.    The Debtor is, upon information and belief, a resident of Moore County, North Carolina.

3.    Plaintiff John J. Harvey, III is a resident of Union County, North Carolina.

4.      Plaintiff Impact Point Consulting, Inc. is a North Carolina corporation with its principal place of business in Union County, North Carolina.

5.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

6.      This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(I) and (J).

## FACTS INCORPORATED IN ALL CLAIMS

7.      In 2011 through early 2013, Harvey acted as an independent consultant, advising and assisting clients to pursue military procurement contracting opportunities.  From August 25, 2011 forward, Harvey conducted this consulting practice through Impact.

8.      In May 2011, a client of Harvey's engaged in the business of armoring vehicles, Ultra Armoring, LLC ("Ultra"), introduced him to the Debtor, under the alias Jon Marshall. The Debtor held himself out also as a consultant to military contractors and a CPA with extensive finance work experience.

9.      The Debtor's representation that he is a CPA was false, and subsequent investigation reveals a pattern of the Debtor telling this lie in order to gain the confidence of prospective business associates to entrust him with custody and management of funds and financial affairs.   In May 2011, Harvey had no reason not to believe the Debtor's representation and did believe him.

10.     Harvey and the Debtor agreed orally to join efforts to advise and assist Ultra to win a contract to furnish to the US Special Operations Command ("SOCOM") approximately 250 armored dual cab pickups and sport utility vehicles, which the military refers to as Non-Standard Commercial Vehicles, abbreviated "NSCVs."  Harvey and the Debtor also agreed to divide resulting compensation 50-50.

11.     In the course of discussing and forming this agreement, the Debtor represented that he conducted his business through a company named Defense Logistics Solutions, Inc. (hereinafter, "DLS").   The Debtor proposed that he and Harvey contract with Ultra and undertake other joint efforts in the name of DLS.  On July 6, 2011, he emailed Harvey to this effect, stating "We need to talk about DLS so you can feel comfortable with the agreement. . . . I think the best solution is to provide you with stock in the country [sic] as well as making you a corporate officer."  (A true copy is attached as Exhibit A.)

12.     Shortly thereafter, the Debtor presented Harvey a stock certificate, purportedly issued on June 15, 2011, and signed by the Debtor (using his alias), as "Secretary/President," for 10,000 common shares of "A North Carolina Corporation Known as Defense Logistics Solutions, Inc."  (A true copy is attached as Exhibit B).

13.     These actual and implied representations also were false.  There was no duly formed corporation named Defense Logistics Solutions, Inc. in May through June 2011.  The Debtor, in conjunction with other business associates, had previously chartered a corporation in that name, but he fell into disagreement with those associates, and the corporation was dissolved of record in January 2011, which the Debtor knew.  The stock certificate the Debtor delivered to Harvey was, accordingly, fraudulent.

14.     Harvey had no particular interest in owning shares in DLS and paid nothing in exchange for the certificate.  Nevertheless, the Debtor intended these representations to assure Harvey that his part in the ongoing representation and consulting relationship with Ultra, and his half-interest in resulting income, were documented in some fashion, so that Harvey would acquiesce in using the DLS name and in the Debtor initially receiving the commission proceeds.  Harvey did rely as the Debtor intended.

15.     Ultra won the targeted contract award on August 19, 2011, which resulted in commissions for Harvey and the Debtor totaling at least $1,507,449.20.  Also on August 19, 2011, Ultra formalized the joint consulting arrangement with Harvey and the Debtor by executing a "Representative Agreement," that is attached as Exhibit C.  The Representative Agreement purports to run between Ultra and DLS, but DLS still did not exist when it was executed.

16.     Both Harvey and the Debtor signed the Representative Agreement, becoming parties thereto in their individual capacity, in light of DLS's lack of corporate existence.

17.     The Debtor formed DLS as a North Carolina corporation on October 26, 2011.  On November 4, 2013, Debtor caused DLS also to file a Chapter 7 bankruptcy petition in this Court, which is pending as Case No. 13-81411.

18.     Harvey was never an officer or agent of DLS.

19.     Ultra began rendering commission statements on January 3, 2012, as it delivered vehicles to SOCOM.  It sent eight commission statements in total, the last on September 8, 2012, emailing copies to both Harvey and the Debtor.

20.     In February 2012, Ultra paid the first commission payment to DLS at its business address in Moore County, North Carolina.  Upon receiving the payment, the Debtor invited Harvey to accompany him to a First Citizens Bank branch in Fayetteville, North Carolina to establish a new checking account in DLS's name, which the Debtor told Harvey was to be used for the deposit of the Ultra commission payments (hereinafter, the "Commission Deposit Account").  Harvey signed what he understood to be the signature card for the account and received a Visa Business Check card.  The Debtor told Harvey that disbursements in excess of $10,000 (upon information and belief) would require two

signatures, one of them being Harvey's. Ultra's first commission payment was the opening deposit into the Commission Deposit Account.

21.     After making this deposit, the Debtor prepared and delivered to Harvey, and Harvey cosigned, two checks for $20,000 each, payable to the order of Impact. These totaled $40,000, comprising roughly Plaintiffs' half of the first commission amount of $81,803.80, per the parties' agreement. True copies of these checks are attached as Exhibit D hereto and incorporated herein by reference.

22.     The Debtor intended his actual and implied representations concerning the Commission Deposit Account and the first two payments therefrom to induce Harvey's reliance that the Debtor would safely and securely handle and administer the Ultra commission payments through DLS and that Harvey would receive his share in due course. Harvey did rely as intended, acquiescing in the Debtor's and DLS's continued receipt and administration of Ultra commission payments. However, the Debtor had no intention of depositing all Ultra commission payments into the Commission Deposit Account, and the represented control on disbursements from the account did not exist.

23.     After making this show of establishing and using the Commission Deposit Account, the Debtor deposited Ultra's next payment, $371,985.20, into a different, pre-existing First Citizens checking account in the name of DLS. Later, the Debtor deposited three more Ultra payments, totaling $473,000.35, into this other First Citizens checking account and another, newly established, checking account at BB&T. DLS bank records reveal that the Ultra payments were received and deposited by the Debtor as follows:

| | | | | | | First Citizens Bank | | BB&T Bank |
|---|---|---|---|---|---|---|---|---|
| | | | | | | 7091 Comm'n Dep. Acct. | 4958 Preexisting | 4555 |
| | | | | | Opening Date | 2/28/2012 | Before 1/1/2012 | 7/3/2012 |
| | | | | | Beginning Balances | $0.00 | $3,922.48 | $0.00 |
| | Ultra Commission Statements Ex C | | | | Bank Xaction Date | Deposits | | |
| Ref. | Stmt. Recd | Amount | Setoffs Taken - Ultra | Net | | | | |
| 1 | 1/3/2012 | $81,803.80 | ($38,567.66) | $43,236.14 | 2/28/2012 | $43,236.14 | | |
| 2 | 3/1/2012 | 381,985.20 | (10,000.00) | 371,985.20 | 4/23/2012 | | 371,985.20 | |
| 3 | 4/2/2012 | 190,992.60 | | 190,992.60 | 5/9/2012 | 190,992.60 | | |
| 4 | 5/7/2012 | 113,055.20 | | 113,055.20 | 6/4/2012 | 113,055.20 | | |
| 5 | 5/30/2012 | 251,178.45 | | 251,178.45 | 7/3/2012 | | | 251,178.45 |
| 6 | 7/19/2012 | 266,612.05 | | 266,612.05 | 8/15/2012 | 266,612.05 | | |
| 7 | 9/8/2012 | 155,314.17 | | 155,314.17 | 12/17/2012 | | 155,314.17 | |
| 8 | 9/8/2012 | 66,507.73 | | 66,507.73 | 2/22/2013 | | 66,507.73 | - |
| | Total | $1,507,449.20 | ($48,567.66) | $1,458,881.54 | <-Total Ultra Revs | $613,895.99 | $593,807.10 | $251,178.45 |

24.    The Debtor did not disclose to Harvey, and until March 2013 Harvey did not learn, that the Ultra payments were not being deposited into the Commission Deposit Account. DLS made additional payments to Impact in Union County, North Carolina, via wire transfer, such that Harvey had no opportunity to realize that such payments were not originating from the Commission Deposit Account.

25.    The table below summarizes Harvey's receipt of payments from DLS, as administered by the Debtor, contrasted with the Ultra commission statements:

| Payments Received by Impact | | | Ultra Commission Statements | | |
|---|---|---|---|---|---|
| Ref. | Date Recd | Amount | Ref. | Date Recd | Amount |
| 1. | 2/16/2012 | $20,000.00 | 1. | 1/03/2012 | $81,803.80 |
| 2. | 3/09/2012 | 20,000.00 | | | |
| | | | 2. | 3/01/2012 | 381,985.20 |
| 3. | 5/02/2012 | 168,072.60 | 3. | 4/02/2012 | 190,992.60 |
| 4. | 5/30/2012 | 101,122.80 | 4. | 5/07/2012 | 113,055.20 |
| 5. | 7/12/2012 | 66,392.45 | 5. | 5/30/2012 | 251,178.45 |
| 6. | 9/05/2012 | 133,306.03 | 6. | 7/19/2012 | 266,612.05 |
| | | | 7. | 9/08/2012 | 155,314.17 |

| **Payments Received by Impact** | | | **Ultra Commission Statements** | | |
| --- | --- | --- | --- | --- | --- |
| Ref. | Date Recd | Amount | Ref. | Date Recd | Amount |
| | | | 8. | 9/08/2012 | 66,507.73 |
| | Total | $508,893.88 | | | $1,507,449.20 |

Harvey understood that Ultra's payments were to follow the commission statements with about a 30-day lag, but as of May 30, 2012, realized that he did not know exactly how much Ultra had paid or how the payments to him had been determined. Harvey asked the Debtor to clarify were things stood.

26.     In response, sometime between the May 30, 2012 receipt of Ultra commission statement No. 5 and the July 12, 2012 payment to Impact of $66,392.45, the Debtor handed to Harvey a spreadsheet printed onto four physical pages, of which a true copy is assembled onto a single page and attached as Exhibit E hereto. The spreadsheet, hereinafter referred to as the "Interim Accounting," purported to account for Harvey's half-share of Ultra commissions through statement No. 5 (in the amount of $251,178.45) and tallied that the amount then due to Impact as $66,392.45. The spreadsheet was the basis for the July 12 payment No. 5 to Impact, of $66,392.45.

27.     In the Interim Accounting, the Debtor omitted to include Ultra's payment for commission statement No. 3, in the amount of $190,992.60, thereby understating the amount then due to Plaintiffs by at least $95,496.30. The Debtor also wrote on the Interim Accounting that Ultra had delivered only 148 out of the 267 vehicles under its procurement contract, such that 119 remained to be delivered, and that Harvey could expect future payments of his half-share of the remaining commissions, in the amount of $357,545.67. This also was false, as 36

more vehicles already had been delivered by Ultra, as reflected in the omitted commission statement No. 3.

28.      In addition, the Interim Accounting stated that Ultra's $251,178.45 commission payment in respect of statement No. 5 (issued 5/30/2012) had not yet been collected. However, well before the July 12 payment to Plaintiffs based on the Interim Accounting, the Debtor received and, on July 3, 2012, deposited the $251,178.45 payment to a new checking account at BB&T Bank, as shown in the summary in paragraph 23 above.  As noted above, the Debtor never voluntarily disclosed the BB&T account to Harvey.   Thus, the Interim Accounting's statement that the $251,178.45 payment had not been received was false.

29.      Debtor intended the misstatements in the Interim Accounting to cover the fact that he had not accounted to Plaintiffs for a full half-share of the Ultra commissions and to perpetuate Harvey's confusion, in order to facilitate the Debtor's planned misappropriation of a significant portion of Harvey's share of the commissions.

30.      Following commission statement No. 5 for $251,178.45, Ultra issued commission statement No. 6, on 7/19/2012, for $266,612.05.  On July 23, 2012, the Debtor attempted to convince Harvey that statement No. 6 was merely an adjusted version of statement No. 5, so that Harvey would not realize that the $251,178.45 payment had been diverted by the Debtor.  The Debtor emailed Harvey, "Ok this one was driving me crazy.... But I think I have figured it out....  When I went to save it my file already had a copy with this name...  looked again and it is an adjustment to the 250,000.00 statement from before......  I guess they actually got out more cars on it."

31.      Although Harvey did not discern the Debtor's purpose, he detected and corrected the Debtor's "confusion" about the two commission statements, emailing back, "No.

I believe that this is a new Ultra statement of account." Harvey noted that statement no. 6 covered different sales invoices than statement no. 5. Further, assuming to be true the Debtor's denial of having received payment for statement no. 5, Harvey stated, "We still have an open statement of account for 05/29/12, in the amount of $251,178.45."

32.     The Debtor -- despite having opened the new BB&T account with the $251,178.45 Ultra payment 20 days earlier -- answered, "Yep.... You are correct...." True copies of the emails referenced in this and the prior two paragraphs are attached as Exhibit F hereto and incorporated herein by reference.

33.     After misappropriating and lying to conceal the $251,178.45 payment, the Debtor split the next Ultra payment with Harvey exactly in half, remitting to Impact $133,306.03 of $266,612.05. However, the next payment after that, $155,314.17, received pursuant to Ultra commission statement No. 7, the Debtor also misappropriated. The Debtor acknowledged to Harvey that DLS received payment of this commission sometime after the 9/8/2013 statement, and told Harvey that he would wait until immediately after year-end to deposit the check and remit Impact's share in order to reduce his and Harvey's 2012 income tax liability. This was a ruse to delay Harvey's discovery that the Debtor was embezzling funds due to Impact. The Debtor had no intention to defer the deposit or pay Plaintiff's share in early 2013.

34.     Instead, as shown in paragraph 23 above, the Debtor deposited the $155,314.17 payment on December 17, 2012 not to the Commission Deposit Account, but to DLS's other First Citizens account.

35.     The Debtor also misappropriated Ultra's final payment, issued November 15, 2012, in the amount of $66,507.73.  This also was deposited to the First Citizens account other than the Commission Deposit Account, as shown in paragraph 23.

36.     In summary, the Debtor misappropriated entirely the following Ultra commission payments in which Plaintiffs owned an undivided half-interest:

| Ref. | Statement Date | Amount |
|------|----------------|--------|
| 1. | May 29, 2012 | $251,178.45 |
| 2. | Aug. 1, 2012 | 155,314.17 |
| 3. | Sep. 8, 2012 | 66,507.73 |
| | Total | $473,000.35 |

In addition to half of this amount, which is $236,500.18, the Debtor also shorted Plaintiffs an additional $8,330.54 in dividing the overall commission total of $1,507,449.20, for total of $244,830.72.

37.     The Debtor expended much of the misappropriated funds via over $600,000 of debit card charges from all three DLS bank accounts between January 2012 and April 2013. Many or most of the charges were personal in nature, including meals, vacation and household expenses, commingled indiscriminately among other expenditures.

38.     In addition, the Debtor caused DLS to expend $85,000 of the Ultra payments to purchase 32.6 acres of real property in Moore County for use as the Debtor's personal residence.  The Debtor also caused DLS to expend funds from the Ultra payments to undertake construction of improvements on the property.

39.     In addition, the Debtor transferred misappropriated funds to associates, whom he designated shareholders and/or directors or officers of DLS, although upon information and belief, neither the Debtor nor these transferees gave bona fide consideration for their shares.

10

The Debtor also transferred funds, without first accounting for Plaintiffs' half-share, to himself and his wife. Transfers to these insiders included the following:

| Date | Transferee | Amount | Insider affiliated |
|------|-----------|--------|--------------------|
| 1/7/2012 | Horizontal Air | $1,000.00 | Leo Barbera |
| 3/5/2012 | Bobfatherops, Inc. | 4,013.45 | Bob Marshall |
| 3/19/2012 | Horizontal Equipment Manufacturing, Inc. | 1,500.00 | Leo Barbera |
| 6/4/2012 | Bobfatherops, Inc. | 5,387.21 | Bob Marshall |
| 6/7/2012 | Traci Marshall | 2,500.00 | Bob Marshall |
| 6/14/2012 | Horizontal Equipment Manufacturing, Inc. | 5,000.00 | Leo Barbera |
| 7/20/2012 | Leo Barbera | 4,000.00 | |
| 9/18/2012 | Bobfatherops, Inc. | 8,791.34 | Bob Marshall |
| 9/27/2012 | JC Hueck | 2,100.00 | |
| 10/9/2012 | Juan Carlos Hueck | 1,200.00 | |
| 10/19/2012 | Juan Carlos Hueck | 2,400.00 | |
| 11/13/2012 | Horizontal Equipment Manufacturing, Inc. | 9,000.00 | Leo Barbera |
| 11/13/2012 | Juan Carlos Hueck | 2,000.00 | |
| 11/20/2012 | Juan Carlos Hueck | 2,200.00 | |
| 12/12/2012 | JC Hueck | 5,000.00 | |
| 12/20/2012 | Juan Carlos Hueck | 3,000.00 | |
| 12/21/2012 | Horizontal Equipment Manufacturing, Inc. | 5,000.00 | Leo Barbera |
| 1/11/2013 | Horizontal Equipment Manufacturing, Inc. | 2,500.00 | Leo Barbera |
| 1/28/2013 | JC Hueck Consltg Co | 5,500.00 | Juan Carlos Hueck |
| 2/13/2013 | Leo Barbera | 10,000.00 | |
| 3/11/2013 | Horizontal Equipment Manufacturing, Inc. | 2,000.00 | Leo Barbera |
| 3/28/2013 | Samantha Marshall | 5,200.00 | Debtor (wife) |
| 5/1/2013 | JC Hueck | 3,000.00 | |
| 5/1/2013 | Horizontal Equipment Manufacturing, Inc. | 1,457.11 | Leo Barbera |
| 5/3/2013 | Bob Father | 20,000.00 | Bob Marshall |
| 5/10/2013 | JC Hueck | 2,301.00 | |
| 5/10/2013 | Horizontal Air | 4,000.00 | Leo Barbera |
| 5/10/2013 | Pat McDole | 5,000.00 | |
| 8/21/2012-5/20/2013 | Samantha Marshall-payroll | 20,979.23 | Debtor (wife) |
| 5/24/2013 | JC Hueck | 2,800.00 | |
| 5/30/2013 | JC Hueck | 10,000.00 | |

| Date | Transferee | Amount | Insider affiliated |
|------|-----------|--------|---------------------|
|      | **TOTAL, AT LEAST** | **$158,829.34** | |

40.    In addition, the Debtor used misappropriated funds to make transfers concerning a "DLS Mexico," including the following:

| Date | Transferee | Amount | Notations |
|------|-----------|--------|-----------|
| 12/14/2012 | Tomas G. Gutierrez | $6,300.00 | "DLS Mexico" |
| 3/14/2013 | Tomas G. Gutierrez | 7,000.00 | |
| 3/15/2013 | Tomas G. Gutierrez | 3,800.00 | |
| 5/6/2013 | Garcia Requejo Sucesores | 5,000.00 | "Defense Logistics Solutions" |
| 6/4/2013 | Garcia Requejo Sucesores | 5,000.00 | |
| 6/4/2013 | Soluciones Logisticas de Defensa | 1,500.00 | |
| 6/12/2013 | Soluciones Logisticas de Defensa | 1,000.00 | |
| | **TOTAL AT LEAST** | **$29,600.00** | |

41.    In addition, the Debtor used misappropriated funds to settle litigation having nothing to do with Plaintiffs.  In the first such instance, the Debtor caused DLS to pay $10,000 on 5/14/2012 to R&J Legal Group, attorneys in Chicago, upon information and belief to resolve litigation against a previous business the Debtor conducted under the name EDC Tactical.  In the second instance, the Debtor caused DLS to pay $25,000 on 4/10/2013 to Moore County attorneys Van Camp Meacham & Newman PLLC for settlement of employment compensation claims by Jeremy Schmidt.

42.    In February 2013, when the deferred payments promised by the Debtor failed to materialize, Harvey investigated and began to discover the Debtor's mishandling of the Ultra commission revenues.  Harvey demanded a meeting and full accounting for all commissions. On March 1, 2013, the Debtor met with Harvey and presented another spreadsheet purporting to summarize the receipt and disposition of Ultra commission payments, of which a copy is

attached as Exhibit G hereto (hereinafter, the "Post-Demand Accounting").  In the Post-Demand Accounting, the Debtor again lied repeatedly, including by:

      a)     stating that the $251,178.46 payment was still "outstanding," even though the Debtor received and cashed it approximately eight months earlier, in July 2012;

      b)     omitting the $66,507.33 payment as if not received, even though the Debtor received it four months earlier and cashed it February 22, 2013;

      c)     stating falsely that DLS had paid sales taxes of $98,272.21;

      d)     stating falsely that DLS had paid income taxes of $70,329.97;

      e)     stating falsely that DLS had paid commissions of $100,000;

      f)     omitting $247,355.82 of Ultra commission payments received; and

      g)     omitting the improper payments (those that had already then occurred) alleged above.

43.     By these additional lies, the Debtor sought to delay and frustrate Plaintiffs' efforts to uncover in full and prevent the further misappropriation of funds remaining under the Debtor's control.  Debtor accomplished that objective.

44.     After giving the Post-Demand Accounting, in March through May 2013, the Debtor carried out a number of the transfers to insiders, as detailed in paragraph 39 above.

45.     After Plaintiffs commenced litigation in April 2013, the Debtor used not less than $85,000 of the misappropriated Ultra commission proceeds to pay lawyers to defend Plaintiff's claims.  Harvey, through counsel, notified these lawyers that the funds were subject to Plaintiffs' property interest well before the funds were consumed in furnishing legal services.

13

46.     Subsequently, in September or October 2013, the Debtor caused the Moore County real property -- purchased with misappropriated Ultra commission proceeds -- to be liquidated and used the resulting proceeds of $64,515.96 also to pay his lawyers.  The lawyers also were notified well before this time that the Debtor used Ultra proceeds in which Harvey had a property interest to acquire this property.

47.     After the August 2011 contract award to Ultra and before commission payments began flowing, Harvey and the Debtor began working together on a larger NSCV contract opportunity in conjunction with a major defense contractor, Battelle Memorial Institute ("Battelle").  Harvey furnished an introduction for the Debtor to Battelle in order to commence this process.

48.     Battelle declined to enter into an agency relationship as Ultra had, but Harvey and the Debtor were offered an opportunity to act as subcontractor in the event Battelle was successful in obtaining an NSCV procurement contract.  Thus, Harvey and the Debtor made extensive arrangements to prepare to procure and resell pickup trucks and SUVs to Battelle and to consult with other prospective supplier/subcontractors, for fulfillment of the anticipated procurement contract.

49.     The Debtor executed a "Teaming Agreement" with Battelle in DLS's name in December 2011, contemplating the formation of a subcontract between DLS and Battelle if Battelle won a prime contract with the military.  Despite the use of DLS's name in the contract, Harvey continuously participated in the Battelle project through late 2012 and was acknowledged in writing by the Debtor as his "partner."

50.     The term of the Teaming Agreement was extended through December 14, 2013, by an amendment dated February 28, 2012.  Accordingly, as of the filing of DLS's bankruptcy

14

petition on November 3, 2013, the Teaming Agreement remained executory unless superseded by a subcontract or terminated by Battelle's and DLS's mutual agreement. The Debtor did not disclose the teaming agreement or any superseding contract in the DLS bankruptcy schedules.

51.     On March 15, 2013, Battelle notified Harvey and the Debtor that it was awarded a blanket purchase agreement in respect of the procurement opportunity. (A true copy of the subject email is attached as Exhibit H hereto and incorporated herein by reference.) Accordingly, the opportunity to which Harvey and Dambowsky applied joint efforts, undertaken in the name of DLS, was ripe to be consummated through the formation of a subcontracting relationship with Battelle. This business opportunity portends more than a million dollars of profits over the term of Battelle's prime contract.

52.     After Harvey demanded a full accounting of the Ultra commissions in February 2013, the Debtor retaliated by isolating Harvey from ongoing communications with Battelle and others relating to the business opportunity and failed to disclose fully his and DLS's activities toward bringing it to fruition.

53.     DLS sold, upon information and belief, fewer than ten vehicles to Battelle for the building of prototypes of the NSCVs to be offered under Battelle's blanket purchase agreement. These sales produced, upon information and belief, revenues of $308,327.81, which the Debtor received in five checks from Battelle between December 2012 and May 2013 but did not deposit until May 2013 -- upon information and belief to keep Harvey from learning about the revenues. The Debtor caused DLS to dispose of all of these funds without any accounting to Plaintiffs.

54.     Other than these revenues from Battelle and the Ultra commission payments, total revenues to DLS from its inception through May 2013 (the last month for which Plaintiffs

have data) were less than $27,000. In other words, DLS never had substantial revenue-producing activity other than the Ultra and Battelle opportunities in which Harvey was a participant.

55.     Upon information and belief, the Battelle blanket purchase agreement award remains in effect, with sales of production model armored vehicles to commence soon.

56.     Upon information and belief, the Debtor continues to pursue the opportunity to sell vehicles to Battelle for armoring and resale to the U.S. government. However, in order to deter Plaintiffs from laying claim to future profits arising from this opportunity, the Debtor has, upon information and belief, strategically filed bankruptcy petitions for himself and DLS, while making arrangements for DLS's vehicle vendor, Crown Agents, to supply vehicles directly to Battelle. The Debtor has, upon information and belief, arranged to participate in future profits from these sales to Battelle in a manner not currently known to Plaintiffs and purposefully concealed by the Debtor from Plaintiffs.

57.     Through concert of action with Crown Agents or its affiliates, upon information and belief, the Debtor has transferred for no consideration the Battelle business opportunity, developed through Harvey's and the Debtor's joint efforts and nominally vested in DLS. Debtor and Crown Agents or an unknown affiliate are, upon information and belief, the transferees of the business opportunity.

58.     Upon information and belief, transfers related to "DLS Mexico," as alleged in paragraph 40 above, were for the purpose of pursuing business opportunities, including facilitating a sale of weapons or weapons parts. Upon information and belief, the Debtor continues to pursue these opportunities and seeks to deter Plaintiffs from pursuing a recovery against future profits arising therefrom by the strategic filing of this case and the bankruptcy of

DLS.  Through concert of action with Juan Carlos Hueck, a resident of Gaston County, North Carolina, and unknown others, upon information and belief, the Debtor has transferred for no consideration these business opportunities, although they were developed with Ultra commission proceeds, in which Plaintiffs owned an undivided half-interest.

## FIRST CLAIM FOR RELIEF
### (Objection to Discharge, 11 U.S.C. § 727)

59.    DLS was a sham and alter ego of the Debtor for all of the following reasons:

a)    the Debtor purported to act in the name of DLS and touted its existence, including by issuing a sham stock certificate to Harvey, before it was duly formed;

b)    DLS was not capitalized;

c)    DLS had no meaningful, bona fide business activity or revenues other than from the Ultra and Battelle business opportunities and served no business purpose other than the nominal one of fronting the joint venture/partnership for a particular undertaking that Harvey and the Debtor conducted in connection with those opportunities;

d)    the Debtor used DLS to misappropriate and conceal from Harvey proceeds of the Ultra and Battelle business opportunities;

e)    the Debtor used DLS bank accounts pervasively as the source of personal expenditures for himself and his spouse, including the purchase and construction of residential real estate;

f)    the Debtor used proceeds of the Ultra and Battelle business opportunities, nominally possessed by DLS, to make transfers without consideration and while DLS was otherwise insolvent, to the Debtor's business associates;

g)    the Debtor used proceeds of the Ultra and Battelle business opportunities, nominally possessed by DLS, to discharge liabilities arising from a prior business under the name EDC Tactical;

h)    the Debtor dominated completely the finances, policy and business practice of DLS since its formation, such that it had no separate mind, will or existence;

i)    the Debtor used his control of DLS to defraud Harvey of his half-interest in approximately $473,000 of the Ultra proceeds and all proceeds of the Battelle opportunity, past and future;

j)    but for the Debtor's use of DLS in this fashion, he would not have come into control of the proceeds and business opportunities that he has misappropriated, such that his use of DLS as alleged is the proximate cause of Plaintiffs' injuries.

60.    Because DLS is a sham and the Debtor's alter ego, its existence should be disregarded.  Accordingly, the transfers by DLS as alleged in paragraphs 36 through 40 must be attributed to the Debtor.

61.    These transfers occurred, in substantial part, within one year before the date of the filing of the Debtor's bankruptcy petition and were with the intent to hinder, delay or defraud creditors, namely Plaintiffs.

62.    Accordingly, the Debtor should denied a discharge per 11 U.S.C. § 727(a)(2)(A).

63.    In addition, the Debtor is currently in the process, upon information and belief, of transferring the Battelle and Mexican business opportunities, such that the Debtor should be denied a discharge per 11 U.S.C. § 727(a)(2)(B).

64.     In the state court litigation that the Debtor evaded by filing this case, the Debtor admitted that Ultra commission proceeds otherwise due to Harvey were expended in pursuit of the Battelle business opportunity.  However, in discovery, the Debtor and DLS failed for over nine months (after service of discovery requests on April 18, 2013) to furnish "documentation of any expenditure you have purported to charge, in whole or in part, against Plaintiffs' share of Ultra Armoring commissions, including all such expenses stated in the" Post-Demand Accounting.  The Debtor and DLS stated no objection to the discovery, only that the responsive records were not "compiled," and promised, but failed, to furnish the records by September 15, 2013.  In an order entered January 14, 2014, the Superior Court found that "Defendants failed to respond to the requests propounded without any valid objection or excuse," compelled them to respond, and concluded that Defendants should be ordered to pay Plaintiffs' fees and costs.  (The Trustee subsequently filed notices of dismissal with prejudice of the Debtor's and DLS's counterclaims in the state court litigation.)

65.     Based on the Debtor's and DLS's inability to produce basic business documentation after an extended period, Plaintiffs infer and allege that the Debtor has either destroyed or concealed or failed to keep or preserve business records substantiating alleged expenses charged against Plaintiffs' Ultra commissions as well as other business transactions of the Debtor and DLS.  Accordingly, the Debtor should be denied discharge pursuant to 11 U.S.C. § 727(a)(3).

66.     Moreover, the Debtor has failed to explain satisfactorily the loss or deficiency of assets to meet DLS's liabilities, given its receipt of revenues of over $1.26 million of revenues from Ultra and Battelle, net of all payments to Plaintiffs, and the inability of DLS or

Debtor to document their business expenses. Accordingly, the Debtor should be denied discharge pursuant to 11 U.S.C. § 727(a)(5).

67.     In addition to DLS's status as Debtor's alter ego, these grounds for denying discharge also apply because DLS is also a debtor in another case and an insider with respect to Debtor, per 11 U.S.C. § 727(a)(7).

## SECOND CLAIM FOR RELIEF
### (Exceptions to Discharge, 11 U.S.C. § 523)

68.     Plaintiffs incorporate herein by reference the preceding claim.

69.     The $473,000 of Ultra commissions that the Debtor misappropriated, the $308,327.81 of Battelle revenues received, and the Battelle business opportunity were all property that the Debtor obtained by false pretenses, false representations and actual fraud, as alleged above. In the alternative to denying the Debtor any discharge, Plaintiffs' claims with respect to such property interests must be excepted from any discharge granted to the Debtor pursuant to 11 U.S.C. § 523(a)(2)(A).

70.     With respect to both the Ultra joint consultation and the Battelle opportunity, Harvey and the Debtor were joint venturers and/or partners for a particular undertaking. Accordingly, the Debtor was acting in a fiduciary capacity in receiving the Ultra commission proceeds and in handling the Battelle business opportunity, all through DLS. The Debtor committed fraud and defalcation while so acting, as alleged above. Accordingly, Plaintiffs' claims with respect to such matters must be excepted from any discharge granted to the Debtor pursuant to 11 U.S.C. § 523(a)(4).

71.     The Debtor embezzled $473,000 of the Ultra commission proceeds by misappropriating them and failing to account for them, after taking possession of them

lawfully, such that Plaintiffs' claims with respect to such proceeds must be excepted from any discharge granted to the Debtor pursuant to 11 U.S.C. § 523(a)(4).

72.     Pursuant to 11 U.S.C. § 523(c)(1), Plaintiffs seek to have these claims excepted from discharge, in the alternative to the preceding claim.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs demand a judgment or order denying the Debtor a discharge or, alternatively, excepting the specified claims from any discharge granted the Debtor.

This 9th day of February, 2014.

_____
J. Daniel Bishop (N.C. State Bar No. 17333)
ERWIN, BISHOP, CAPITANO & MOSS, P.A.
4521 Sharon Road, Suite 350
Charlotte, North Carolina  28211
Telephone:  (704) 716-1200
Fax:  (704) 716-1201
E-mail:  dbishop@ebcmlaw.com

Attorney for Plaintiffs